# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS
# EASTERN DIVISION

———————————————————————— )
In re:                                                )        Chapter 7
                                                         )        Case No. 10-19012-HJB
    INTERNATIONAL GOSPEL PARTY          )
    BOOSTING JESUS GROUPS, INC.,        )
                                                         )
                    Debtor                         )
———————————————————————— )

## MEMORANDUM OF DECISION

Before the Court is a "Motion to Alter Judgment or for New Trial/Hearing Pursuant to Bankruptcy Rule 9023 and/or for Relief under Bankruptcy Rule 9024 with Respect to Denial of Co-Broker Commission to Jeff Ross [Docket No. 98]" (the "Motion for Reconsideration") filed by Jeff Ross, the buyer and purported co-broker of certain real estate located at 554 Massachusetts Avenue in Boston, Massachusetts (the "Property"), previously owned by the Chapter 7 debtor, International Gospel Party Boosting Jesus Groups, Inc. (the "Debtor").  On September 6, 2011, the Court approved payment of a commission on the sale to Cabot & Company ("Cabot"), the authorized broker.  But the Court denied Cabot's request to share that commission with Ross.  By his Motion for Reconsideration, Ross now asks the Court to reconsider that Order and allow payment to Ross or to schedule a new hearing (perhaps evidentiary) on the matter.  For the reasons set forth below, the Motion for Reconsideration will be DENIED.

I.      FACTS AND TRAVEL OF THE CASE

The Debtor, a Massachusetts non-profit organization, filed this case under Chapter 11 of the United States Bankruptcy Code[1] on August 19, 2010.  According to the Debtor's schedules, the Property was the Debtor's only discernible asset at the time of filing.  In Schedule A-Real Property, the Debtor estimated the Property's value at $1,425,100, and disclosed encumbrances totaling $775,000.

Shortly after the case filing, it became apparent that the Debtor was operating without the benefit of cash collateral authorization.  Accordingly, on October 12, 2010, the Court, *sua sponte*, ordered the appointment of a Chapter 11 trustee; on October 15, the Court approved the appointment of Attorney Joseph G. Butler (the "Trustee").

The Trustee ultimately concluded that the best course of action would be a sale of the Property,[2] and on January 14, 2011, the Trustee filed an application for leave to employ Cabot as his real estate broker (the "Employment Application").   In that application, and in an accompanying affidavit from Joseph Palermino (the managing

---

[1] See 11 U.S.C. § 101 et seq. (the "Bankruptcy Code" or the "Code").  All references to statutory sections are to the Bankruptcy Code unless otherwise specified.

[2] After his initial investigation, the Trustee had reported to the Court in October 2010 that the Debtor's scheduled value of the Property (based on a municipal assessment) had been overstated; that the total balance due on the first and second mortgages was $800,000; and, in the Trustee's opinion, a reorganization of the Debtor was not reasonably in prospect.  At that time, the Trustee recommended dismissal of the case and, in support thereof, filed a motion to dismiss (the "Motion to Dismiss").  The Debtor opposed dismissal, hoping that it would receive a cash infusion sufficient to bring the first mortgage current and pay off the second mortgage in full, at which time the Debtor itself might request dismissal of the case.  The Trustee agreed to continue resolution of his Motion to Dismiss in order to accommodate the Debtor, and the case dragged on with slight progress until the Trustee, having determined that a sale of the Property was worthwhile, withdrew his Motion to Dismiss on January 24, 2011.  Although the United States trustee then filed a motion to dismiss the case on January 25, the hearing on that motion has been continued generally.

partner of Cabot), Cabot represented that it was "disinterested" as defined in § 101(13),

and, notwithstanding the stated terms and conditions of Cabot's employment, Cabot's

compensation would be subject to Court approval.   Among the terms and conditions

outlined in the Cabot's Employment Application was a provision specifically addressing

Cabot's contemplated commission and the circumstances under which that commission

might be shared:

> The Broker has agreed to accept compensation on a commission basis based upon a commission/fee of five (5%) percent of the total gross sale price for the Real Property, payable only if the sale of the Real Property by the Estate to a buyer is approved by the Court, is closed, a deed is recorded, proceeds disbursed and upon the entry of an order of the Bankruptcy Court, after an appropriate application, authorizing the payment of a commission.   In the event that a successful buyer of the Real Property is produced through the efforts of a buyer's agent/co-broker, the Broker will divide any commission received with that buyer's agent/co-broker.   Any such division or sharing of the commission will be disclosed in any application by the Broker for compensation.

Employment Application, at 3-4 ¶15, ECF No. 37.   On February 1, 2011, Cabot's

Employment Application was allowed.

By April 13, 2011, the Trustee and Cabot had made progress, and on that day,

the Trustee filed a motion for leave to sell the Property to Robert Alessandro for the sum

of $1,135,000 (the "Sale Motion"), in accordance with the terms of an attached

Purchase and Sale Agreement (the "Alessandro PSA").   The Alessandro PSA recited,

*inter alia*, the broker's commission of 5%, subject to Court approval:

18.    BROKER'S FEE

> Seller shall pay to [Cabot] a broker's commission equal to five percent (5%) percent [sic] of the Purchase Price as of the Closing Date in connection with the sale transaction contemplated hereby ~~to be divided equally between the Broker and _____ ("Co Broker")~~, which commission shall only be due in the event this transaction closes in accordance with the terms hereof and the full consideration is paid and the

> Broker's commission is approved by the United States Bankruptcy Court
> for the District of Massachusetts in case no. 10-19012.  Purchaser and
> Seller represent to each other that the Purchaser and Seller have not
> been contacted by or dealt with any broker, finder or intermediary of any
> kind in connection with the transaction contemplated hereby other than
> Broker ~~and Co-Broker~~.

Sale Mot., Ex. 1, at 3, ECF No. 58 (strikethroughs in original).

In connection with the Sale Motion and consistent with Massachusetts Local Bankruptcy Rule 6004-1(c)(3), the Trustee prepared a Notice of Intended Private Sale of Real Property (the "Sale Notice").  The Sale Notice invited interested persons to provide higher offers for the Property and stated the conditions therefor, including the minimum overbid, the amount and form of the counterofferor's minimum deposit, and the deadline for bidding.  Those conditions also included the requirement that "[h]igher offers must be on the same terms and conditions provided in the [Alessandro PSA], other than the purchase price."  Sale Notice, at 2, April 15, 2011, ECF No. 59.

Two timely higher offers were received; Neelon Properties, LLC ("Neelon") and Jeff Ross filed counteroffers in the respective amounts of $1,185,000 (the "Neelon Counteroffer") and $1,186,000 (the "Ross Counteroffer").  Each counteroffer was filed as a "Notice of Higher Offer," and each represented that it was made "in conformance with the [Sale Notice]."  Neelon Counteroffer, May 19, 2011, ECF No. 66; Ross Counteroffer, May 23, 2011, ECF No. 68.  Each counteroffer also included an attached purchase and sale agreement (the "Neelon PSA" and the "Ross PSA," respectively). Although the Ross Counteroffer represented that it was "in conformance with the [Sale Notice]," and, therefore, "on the same terms and conditions provided in the [Alessandro PSA]," this was not true.  Paragraph 18 of the Ross PSA differed from Alessandro PSA; it provided:

18.    BROKER'S FEE

Seller shall pay to [Cabot] a broker's commission equal to five percent (5%) percent [sic] of the Purchase Price as of the Closing Date in connection with the sale transaction contemplated hereby *to be divided equally between the Broker and Jeff Ross ("Co-Broker")*, which commission shall only be due in the event this transaction closes in accordance with the terms hereof and the full consideration is paid and the Broker's commission is approved by the United States Bankruptcy Court for the District of Massachusetts in case no. 10-19012.  Purchaser and Seller represent to each other that the Purchaser and Seller have not been contacted by or dealt with any broker, finder or intermediary of any kind in connection with the transaction contemplated hereby other than Broker *and Co-Broker*.

Ross Counteroffer, at 5 ¶ 18 (emphasis supplied).   Despite the fact that Ross was identified in this paragraph as a "co-broker," nothing in the body of the Notice of Higher Offer alerted the Court that the Ross PSA was not, as represented, "in conformance with" the Sale Notice.  By virtue of the altered Paragraph 18, the Ross Counteroffer was not on the "same terms and conditions" as the Alessandro PSA (or, for that matter, the Neelon PSA).

On May 24, 2011, the Court conducted a hearing on the Sale Motion (the "Sale Hearing").  The Trustee advised the Court that three parties were interested in bidding for the Property, and, on the Trustee's recommendation, the Court asked the parties to submit sealed bids.[3]   After submission of the bids – Alessandro's in the amount of

---

[3] At the outset of the hearing, the Debtor objected to the sale on grounds that the Debtor had just received a letter from an entity offering the Debtor a loan in the amount of $950,000 – an amount sufficient to pay all of the creditors, including all administrative expenses.  The Court declined to continue the Sale Hearing, but ordered that the sale not close before June 23, 2011 and that closing would be contingent on the case not having being dismissed before that time.  And the Court advised that the case would only be dismissed if, at the time of dismissal, the Debtor had secured funds to pay all prepetition secured and unsecured claims, all administrative claims, and a breakup fee to the successful bidder.  After a short recess, the parties agreed that, if the case were dismissed before the closing, the breakup fee for the

$1,226,000, Neelon's in the amount of $1,276,000, and Ross's in the amount of $1,326,001 – the Court declared Ross the successful bidder. The Court then requested, and the Trustee later submitted, a proposed order; the order was entered on the docket on June 9, 2011 (the "Sale Order"). The sale of the Property to Ross ultimately closed in early July 2011.

On June 21, 2011, the Trustee filed a motion "to pay Real Estate Broker's Commission as an Administrative Expense" (the "Motion to Pay Broker"), accompanied by an "Application for Fee and Affidavit" filed by Cabot (the "Cabot Application"). The Court held a hearing on both the Motion to Pay Broker and the Cabot Application on September 6, 2011 (the "Compensation Hearing"). But what would typically have been a rather routine hearing on an application to pay a broker's commission on a successful sale was complicated by the assertion in the Motion to Pay and the Cabot Application that Cabot intended to divide its broker's commission with Ross. Cabot and the Trustee represented that Cabot had agreed with Ross, at or before the submission of Ross's Counteroffer, to treat Ross as a co-broker in the sale of the Property. The effect of that agreement would be Ross's receipt of one-half of Cabot's commission – or $33,150.33.

The Court's view of this sharing arrangement was decidedly negative. Referring to the practice of sharing a broker's commission with a buyer as a "horrific precedent," the Court noted that no one had disclosed in open court at the Sale Hearing that Ross

---

winning bidder would be "capped" at $15,000 and limited to the reasonable and necessary expenses incurred by the winning bidder in preparation for the closing. On June 23, 2011, the Debtor filed an emergency motion to dismiss the case. However, because the motion was filed late in the day with no likelihood that it could be scheduled in time to give appropriate notice, and, more importantly, "because the proposed financing contained ambiguous conditions," Order on Emergency Mot. of Debtor to Dismiss, June 12, 2011, ECF No. 82, the Debtor's motion to dismiss was denied. No appeal, motion for reconsideration, or request for stay followed.

would receive a commission if he were the successful bidder.  The Court further observed that "disclosure" of such an arrangement in a purchase and sale agreement attached to a counteroffer, which agreement was *supposed* to be in conformance with the original, was insufficient absent further conspicuous disclosure.  The Court reminded the parties that Cabot had been authorized by the order allowing Cabot's Employment Application to share its commission with an *agent or co-broker for the buyer*, and not with the buyer himself.  Accordingly, the Court granted the Cabot Application in the amount of $33,150.33[4] and cautioned Cabot not to share any of the allowed commission with Ross or any affiliate of Ross.  See Order on Cabot Application, Sept. 6, 2011, ECF No. 98.  And as to the Trustee's Motion to Pay Broker, the Court granted the Trustee leave to pay Cabot "the sum of $33,150.33 as an administrative expense," Order on Mot. to Pay Broker, Sept. 6, 2011, ECF No. 99 (together, the "Compensation Orders").

The instant Motion for Reconsideration followed.[5]  In the motion, Ross asserts that the Court received sufficient notice of Ross's dual status as both buyer and co-broker.  Specifically, Ross points to the second page of his counteroffer, where he indicated that his offer was based "on the terms and conditions set forth in the *attached Standard Form Purchase and Sale Agreement.*" Mot. for Recons., at 6, 12, Sept. 16, 2011, ECF No. 104; see Ross Counteroffer, at 2.  That agreement was signed by Ross

---

[4] Because Cabot had, through its application, requested only half of the commission to be paid to it, the Court considered the balance as having been waived.  Cabot has neither appealed nor requested reconsideration of the Court's relevant orders.

[5] The Motion for Reconsideration does not state for which of the Compensation Orders Ross seeks reconsideration.  The Court will assume that the Motion for Reconsideration applies to both.

as both "Jeff Ross" and "Jeff Ross Co-Broker." Ross Counteroffer, at 6, 9. And, as previously discussed, the Ross PSA identified Ross as a "co-broker" in paragraph 18. Id. at 5 ¶ 18.

Ross then emphasizes that the Sale Order repeatedly refers to "the Purchase and Sale Agreement," Mot. for Recons., at 3 ¶ 8, and that he was specifically found therein to be a "good faith purchaser," id.; see Sale Order at 5 ¶ 10, June 9, 2011, ECF No. 70. And Ross further implies that if he had known at the Sale Hearing that the Court would not countenance his co-broker status, he would not have bid as high as he did. Summing up, Ross argues:

> While the Court was well within its right to disapprove of the Ross' [sic] co-broker arrangement, it should, in fairness to all parties relying upon its Orders, have refused to allow the sale to Ross with the fully disclosed co-broker agreement, should not have allowed Ross to bid more than $100,000 over the next highest bidder[6] on the basis that Ross was a co-broker and Ross should not have been required to close a sale on a publicly filed and Court-approved Purchase and Sale Agreement providing for his co-brokerage, only to find that new rules would be established after the game had been played. Had Ross been aware of any issue with respect to his co-broker status prior to the sale, he would have adjusted his sealed bid accordingly. Had Ross been aware of any issue with respect to his co-broker status prior to the September 6, 2011 hearing, he would have been prepared to demonstrate, or would have had counsel prepared to demonstrate, the nature and extent of the disclosures and rulings already made on the co-brokerage agreement.

Mot. for Recons., at 5 ¶ 13.

---

[6] Ross is mistaken. He bid $1,326,000 – only *$50,000* more than the next highest bid of $1,276,000. But his point is made. Even if his expected $33,150.33 commission were deducted, his bid would have exceeded the next highest bidder by the sum of $16,849.67.

II.    DISCUSSION

This Court has recently had occasion to address the standards applicable to a request for reconsideration.  In Giza v. Amcap Mortgage, Inc. (In re Giza), the Court opined:

> The standard which this Court should apply in determining a request for reconsideration is well-settled:
>
>> A motion for reconsideration is not a vehicle for raising issues or citing authorities a party could or should have presented prior to the court's ruling.  It is not a vehicle for rehashing arguments previously made or for refuting the court's prior ruling.  A motion to reconsider is appropriate where the court has clearly misunderstood a party, has made a decision outside the issues presented by the parties, has made an error not of reasoning but apprehension, or where there has been a significant change in the law or the facts since the court's prior ruling.  In re Grand Builders, Inc., 122 B.R. 673, 675 (Bankr. W.D .Pa.1990) (citations omitted).  Unless the movant can demonstrate 'manifest errors of fact or law' reconsideration is inappropriate; it is not a substitute for an appeal.  In re Oak Brook Apartments, 126 B.R. 535, 536 (Bankr. S.D. Ohio 1991).
>
> In re Mortg. Inv. Corp., 136 B.R.  592, 597 (Bankr. D. Mass. 1992); see also In re Wedgestone Fin. Corp., 142 B.R. 7, 8 (Bankr. D. Mass. 1992) ("To succeed on a motion to reconsider, the Court requires that the moving party show newly discovered evidence or a manifest error of fact or law.").

In re Giza, Slip Copy, Bankr. Nos. 07-41782-HJB, 09-30886-HJB, Adv. Proc. No. 09-3032, 2011 WL 5439303, *2 (Bankr. D. Mass., Nov. 09, 2011).

Ross has offered no newly discovered evidence.  In fact, according to Ross, the documents which were before the Court at the Compensation Hearing demonstrate his entitlement to one-half of the brokerage commission.  And, frankly, the Court ought not spend much time considering arguments that should have been made at the

Compensation Hearing, a hearing which Ross, an attorney, chose to attend.[7]

Nevertheless, Ross is entitled to consideration of whether the Court made any "manifest

error" in disallowing his claimed compensation, and to that inquiry the Court now turns.

There are at least three reasons why the Court concludes that no error, manifest

or otherwise, was made in disallowing Ross's request for compensation as a co-broker;

each reason is separately sufficient (and certainly so when considered together) to

reaffirm the Court's Compensation Orders.

First, Ross's repeated assertion that he made adequate disclosure to the other

parties and to the Court of his co-broker agreement with Cabot – an assertion upon

which his remaining arguments are largely premised – is, at the very least,

disingenuous. The Ross PSA was not filed as a separate document, but was filed as an

attachment to his "Notice of Higher Offer" and "Offer to Purchase." See Ross

Counteroffer, ECF No. 68. The Notice of Higher Offer, consisting of a single page,

*begins* with the statement that Ross "hereby submits a higher offer *in conformance with

the Notice of Intended Private Sale of Real Property."* Id., at 1 (emphasis supplied).

That Notice of Intended Private Sale (the Sale Notice filed by the Trustee) required that

"[h]igher offers must be on the same terms and conditions provided in the [Alessandro

PSA], other than the purchase price." Sale Notice, at 2. In reality, the Ross PSA was

*not* in conformance with the terms and conditions of the Alessandro PSA, because it

reserved to Ross the ability to recover one-half of the broker's 5% commission. The

Ross *PSA* disclosed in paragraph 18 that Ross would claim that sum. But no party,

including the Court, was obligated to hunt through the attached agreement for

---

[7] The Court takes judicial notice that records of the Massachusetts Board of Bar Overseers and the United States District Court for the District of Massachusetts indicate that Ross is an attorney in good standing of both bars.

10

discrepancies from the original in light of Ross's plain statement on page 1 that his counteroffer conformed to the Sale Notice and, consequently, the Alessandro PSA. Ross's argument that his arrangement with Cabot was fully disclosed is without merit.

Second, Ross apparently assumes that the Sale Order adopted the terms of the Ross PSA.[8]  Not so.  The term "Purchase and Sale Agreement" is a defined term in the Sale Order and refers to the agreement attached to the *original* Sale Motion (i.e., the Alessandro PSA), and not to the agreement submitted with Ross's Counteroffer, as evidenced by the first paragraph of the order:

> [The Trustee] filed on April 13, 2011 . . . the "Sale Motion" . . . *to which was attached a Purchase and Sale Agreement* [the Alessandro PSA] (*the "Purchase and Sale Agreement"*) . . . .

Sale Order, at 1 (emphasis supplied).  Furthermore, the Sale Order did not "approve" the Ross PSA; instead, it provided that "[t]he *Sale Motion* is allowed except as modified by the terms of this Order."  Id., at 2 ¶ (emphasis supplied).  Accordingly, the Court

---

[8] This argument is not explicitly made, but is implied in the Motion for Reconsideration, where Ross states:

> 8. . . . [T]his Court entered its Order re: [the Sale Motion] (the "Sale Order") which provided, in pertinent part, as follows:
>
> > 1.    The Sale Motion is allowed except as modified by the terms of this Order.
> >
> > 2.    . . . the Trustee is authorized and directed to sell to Jeff Ross (the "Successful Bidder") . . . free and clear . . . excepting only those adjustments as set forth in paragraph 16 of the Purchase and Sale Agreement . . .
>
> The Sale Order refers to the Purchase and Sale Agreement in at least five places. . . . This Court, in paragraph 10 of the Sale Order, retained jurisdiction to "enforce and implement the terms of the Purchase and Sale Agreement . . ."

Mot. for Recons., at 3-4 ¶ 8 (emphasis in original); see also id. at 5 ¶ 13 (referring to the Ross PSA as a "Court-approved Purchase and Sale Agreement").

approved the sale based on the terms and conditions of the Alessandro PSA, not on the

terms and conditions of the Ross PSA.[9]

Third, and most important, the proposed payment to Ross cannot credibly be

characterized as a broker's commission, because Ross was not a broker in the

proposed transaction.  A broker is one who acts as an agent for another:

> The most important determining factor of what constitutes a
> "broker" is whether the party is dealing for itself or for another.  A broker
> . . . does not deal on its own account.  Two preliminary requirements
> must be met for a finding that an individual is acting as a broker: (1) the
> person is acting for compensation; and (2) the person is acting on behalf
> of someone else.

Black's Law Dictionary 219 (9th ed. 2009) (quoting 12 Am. Jur. 2d Brokers § 1

(1997)).  Here, Ross was a – in fact, *the* – principal.  He cannot get paid as his own

agent.[10]  Cabot was authorized by this Court's allowance of its Employment Application

to share its commission with a *broker*.  It was not authorized to share its commission

with a buyer.  The former is a co-brokerage.  The latter is akin to a kickback.[11]

---

[9] The Sale Order also noted that the *purchase price* was subject to certain adjustments provided
in Paragraph 16 of the Alessandro PSA.  See Sale Order, at 2 ¶ 2 ("[T]he trustee is authorized
and directed to sell to Jeff Ross . . . for the sum of . . . $1,326,001 . . . , free and clear of all
liens, claims, encumbrances and interests of any kind or nature, *excepting only those
adjustments as set forth in Paragraph 16 of the Purchase and Sale Agreement* . . . .") (emphasis
supplied).  But the "adjustments" to which that part of the Sale Order refers (adjustments for
water and sewer charges, collected rents, remaining fuel and taxes) do not implicate and are
not relevant to the broker's commission.

[10] Furthermore, the events anent the closing of the transaction well demonstrate Ross's
inappropriate conflation of the brokerage commission with the purchase price itself.  At the
Compensation Hearing, the Trustee reported that Ross had asked the Trustee to credit the
amount of his anticipated brokerage commission against the purchase price.  The Trustee,
wisely, declined.

[11] In this respect, Cabot was fortunate to have been allowed payment of one-half of the
brokerage commission.  Disallowance of the entire commission may have been warranted.

Finally, the Court must address Ross's argument that sounds in some sort of judicial estoppel.  Ross complains that if the problem with the expected commission were known by him in advance, he might not have bid as much as he did.  He calls foul at having closed on the sale, "only to find that new rules would be established after the game had been played."  Mot. for Recons., at 5 ¶ 13.  In this statement, Ross puts direct focus on the underlying policy question.  And that is a question to which this Court is obligated to respond: a bankruptcy court sale is not a "game."  Nothing would so quickly denigrate the integrity and reputation of the bankruptcy courts than an appearance, in conducting the sale of bankruptcy estate assets, of giving certain bidders advantages over others or permitting bids to be manipulated by sleight of hand.  Nothing would so quickly chill legitimate bidders from participating in bankruptcy court sales than the public impression that such sales are unfairly conducted.

III.    CONCLUSION

For all of the foregoing reasons, the Motion for Reconsideration will be DENIED.  A separate order will enter forthwith.

DATED:  January 24, 2012

_____
Henry J. Boroff
United States Bankruptcy Judge